ASHER KAUFMAN,

       PLAINTIFF,

    v.

CITY OF CHICAGO, et al.

       DEFENDANTS.

No. 17-cv-07491

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Asher Kaufman brings this action against Chicago Police Lieutenant Andrew Dakuras, Sergeant Joseph Mirus, and the City of Chicago, alleging excessive force, illegal seizure, and failure to intervene under 42 U.S.C. § 1983, and malicious prosecution and intentional infliction of emotional distress ("IIED") under Illinois law. In advance of trial, which is scheduled to begin on May 12, 2021, the parties filed several motions *in limine* seeking either to bar or permit the jury from hearing certain evidence. The Court resolved most of the motions at the pre-trial conference on April 30. A few motions remained outstanding, however, including Kaufman's motions *in limine* Nos. 4 and 14, and Defendants' motion *in limine* No. 6.[1] For the following reasons, Kaufman's motion *in limine* No. 4 is denied without prejudice, Kaufman's motion *in limine* No. 14 is denied in part and granted in part, and Defendants' motion *in limine* No. 6 is denied in part.

---

[1] Kaufman filed motion *in limine* No. 15 on May 10, 2021. This opinion does not address that motion because it is still being briefed by the parties.

## Background[2]

This case arises from an incident near Wrigley Field on November 2, 2016, the night the Chicago Cubs won the World Series in Cleveland. The Wrigleyville neighborhood was crowded and lively as the Cubs had won their first championship in 108 years. Plaintiff Asher Kaufman alleges that he and his girlfriend stopped at a 7-Eleven shortly after the game ended, purchased beer and a half-pint of whisky, and then joined the fans celebrating near Wrigley Field. As they walked down Clark Street, Defendant Mirus grabbed Kaufman outside The Gingerman Tavern, searched him, and confiscated the recently-purchased alcohol, which Kaufman had placed inside his front pockets. Mirus was working undercover and dressed in black, so Kaufman had no idea that he was a Chicago Police officer and assumed instead that Mirus was a bouncer for The Gingerman Tavern. Kaufman explained to Mirus that he had not been inside the bar and asked him to return the alcohol. Mirus declined and shoved Kaufman away. Kaufman then asked Mirus if he was a police officer and attempted to take a picture of him with his cell phone. Mirus told Kaufman that he was not going to return the alcohol and ordered him to "get out of here."

Kaufman and his girlfriend complied, and started walking away. But after a few short steps, Kaufman noticed that his pant zipper had been pulled down. Presuming that Mirus pulled on the zipper during the search, Kaufman turned

[2] The salient facts of this case, many of which are in dispute, are taken from Kaufman's complaint and the parties' motions. While much of the motion *in limine* briefing addressed in this opinion was filed under seal, this opinion is not. Only in rare cases should a court's reasoning for a ruling be under seal. This is not one of those rare cases.

around and exchanged words with Mirus again. At this time, Defendant Dakuras—wearing a grey hoodie and also working undercover—came up to Kaufman and struck him in the chest and then again with both hands. Not realizing that Dakuras was with the Chicago Police, Kaufman responded by getting into a defensive crouch and telling Dakuras not to hit him again. He also moved his cell phone to his right hand and focused the camera on Dakuras, trying to record him. Dakuras allegedly said "come on motherfucker, let's go," to which Kaufman replied, "I'm going to defend myself if you hit me again." Kaufman then noticed a uniformed police officer nearby and yelled for help. As the officer approached, Dakuras struck Kaufman again. Kaufman asked the uniformed officer to arrest Dakuras, but the officer didn't say or do anything, so Dakuras struck Kaufman another time. Kaufman then moved his phone toward the officer and repeated his plea for help. Dakuras shoved Kaufman once again, and then grabbed Kaufman's phone and ran.

Kaufman immediately chased Dakuras into the crowd. He eventually caught up to Dakuras, grabbing him around the waist and taking him down, causing Kaufman's phone to fly out of Dakuras' hand. Kaufman dove toward the phone but was quickly "pounced on" by several uniformed officers. Dakuras then allegedly said, "I'm an undercover cop, you're fucked now. I love this part, free shots." Dakuras proceeded to grab Kaufman by the hair and punch his face, head, and temple. Kaufman could see Mirus standing there while this happened. Dakuras then jumped on top of Kaufman and drove Kaufman's head into the pavement several times. Still

not finished, Dakuras then moved to Kaufman's side and pushed his knee against Kaufman several times while inserting an object into his ear.

Kaufman was arrested shortly thereafter and driven to the hospital by Dakuras and Mirus. While on the drive, Kaufman allegedly asked if they "realize how many cameras there are out here?" Dakuras purportedly responded by saying, "if you so much as move I'll shoot you in the face." To prove that he was serious, Dakuras allegedly pointed his gun in Kaufman's direction.

Kaufman was later charged with battery, resisting or obstructing arrest, and drinking on a public way. In July 2017, a state court judge found him not guilty of battery and drinking on a public way, but guilty of resisting or obstructing arrest. Kaufman then filed this case in October 2017, bringing claims against Dakuras, Mirus, unknown police officers, and the City of Chicago. Kaufman later dismissed the unknown officers as defendants, and dropped claims for battery and conversion. Thus, the remaining claims and defendants heading into trial are as follows: excessive force, malicious prosecution, and IIED against Dakuras and Mirus; illegal seizure against Dakuras; and failure to intervene against Mirus. The city remains in the case based on a claim for indemnification. The malicious prosecution claim involves allegations that Dakuras and Mirus wrote false police reports to cover up their misconduct outside of Wrigley Field.

Neither party filed motions for summary judgment. As mentioned, most of the motions *in limine* were resolved at the pre-trial conference on April 30. Therefore,

this opinion focuses on Kaufman's motions *in limine* Nos. 4 and 14, and Defendants' motion *in limine* No. 6. The Court turns to those motions next.

## Legal Standard

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). "Trial courts issue rulings on motions *in limine* to guide the parties on what evidence it will admit later in trial," and "[a]s a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). A motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings" in that it "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

## Analysis

Kaufman's motion *in limine* No. 4 seeks to admit evidence of Dakuras' and Mirus' disciplinary history. According to Kaufman, more than 70 civilian complaints have been filed against Dakuras over the past several decades, while more than 25

complaints have been filed against Mirus. Many of these complaints are highlighted in the motion, as is a civil lawsuit filed against Dakuras in 2016.[3] Kaufman argues that the allegations described in the complaints and lawsuit are admissible under Federal Rule of Evidence 404(b). Similarly, Kaufman's motion *in limine* No. 14 seeks to admit evidence from an incident last year in which the Chicago Police Department's Bureau of Internal Affairs found that Dakuras had violated several policies and practices, and recommended that he be suspended for 30 days. Kaufman argues that the incident is admissible under Rules 404(b) and 608(b), and should otherwise be admitted for purposes of punitive damages. Defendants take the opposite position in their motion *in limine* No. 6, arguing that no evidence of pending or past civilian complaints, lawsuits, or other disciplinary actions against Dakuras or Mirus should be admitted at trial.

The incidents highlighted in Kaufman's motions are considered in turn.

### 1. Dakuras' Firearm Discharge and One-Day Suspension

In 2014, Dakuras allegedly fired his gun at his wedding portrait which sat on the front window frame of his house. R. 80 at 6. The bullet shattered the window and hit the front steps of a home across the street. R. 80-1 at 2. Dakuras later said that

---

[3] At the status hearing on May 7, 2021, defense counsel informed the Court that efforts were underway to share documents with Kaufman related to another lawsuit and other civilian complaints involving Dakuras and/or Mirus that were not produced during discovery. The Court informed the parties that after Kaufman has an opportunity to review the documents, he will be allowed to argue that they should be admitted into evidence. Thus, this opinion addresses only the arguments and events that Kaufman has raised in his motions filed to date, excluding motion *in limine* No. 15, which is still being briefed. Moreover, troubling issues related to the timing of defendants' recent disclosures will be addressed after trial.

he was surprised a bullet was in the chamber of the gun, and argued that pointing his gun in the direction of the window was an "appropriate technique." R. 80 at 6. The Chicago Police Department ("CPD") gave Dakuras a one-day suspension. *Id.* Kaufman argues that the suspension was relatively light, and that both the shooting and suspension should be admitted under Rule 404(b) because they show how Dakuras "knew" CPD would have his back on the night of incident, and how Dakuras' "state of mind" outside of Wrigley Field was that "he could do whatever he wanted without consequence from the Department." R. 80-1 at 2.

"Rule 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts for the purpose of proving a person's character or propensity to behave in a certain way, but permits the use of this evidence for other purposes . . . such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014) (citing Rule 404(b)). "Rule 404(b) is not just concerned with the ultimate conclusion, but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence." *Id.* at 856 (citing *United States v. Reed*, 744 F.3d 519, 524-25 (7th Cir. 2014)). "In other words, the rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Gomez*, 763 F.3d at 856.

A court reviewing the admissibility of Rule 404(b) evidence "should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the evidence is relevant to that purpose—or more specifically, how

the evidence is relevant without relying on a propensity inference." *Id.* Further, if the proponent of the evidence "can make this initial showing, the district court must in every case assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great." *Id.* at 860. "The court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case." *Id.*

With this in mind, the first problem for Kaufman is that his argument is not supported by a propensity-free chain of reasoning. What Dakuras supposedly "knew" from the shooting incident in 2014 is that he used his service weapon inside his own home and received a one-day suspension. Kaufman asks the Court to conclude that Dakuras inferred from this knowledge that he would have CPD's backing if he used excessive force in a totally unrelated situation several years later. Not only is that an unreasonable inference, it's also impermissible under Rule 404(b) since it suggests that Dakuras has a propensity to act with impunity. *See Harris v. City of Chicago*, 2017 WL 2462197, at *3 (N.D. Ill. June 7, 2017) (other-act evidence inadmissible where "jury could infer [that the officer] intended to coerce a false confession" since he "may have done so in the past").

The second problem is that even if the Court assumed that the shooting and one-day punishment were admissible through a non-propensity theory, any probative value that might exist is substantially outweighed by the risk of unfair prejudice under Rule 403. As the Seventh Circuit has explained, Rule 403 excludes "other-act

evidence that may be slightly probative through a non-propensity theory but has a high likelihood of creating unfair prejudice by leading a jury to draw conclusions based on propensity." *Gomez*, 763 F.3d at 857.

Starting with the probative inquiry, Dakuras' knowledge of the shooting and one-day suspension is not even arguably relevant to whether he used excessive force against Kaufman or maliciously prosecuted him. *Burton v. City of Zion* is instructive on this point. 901 F.3d 772 (7th Cir. 2018). In that case, which involved allegations of excessive force, the defendant-officer filed a motion *in limine* asking that any reference to a previous use-of-force incident involving him and the plaintiff be omitted from evidence. In the previous incident, the defendant-officer handcuffed the plaintiff and then, while she was handcuffed, used a taser to stun her. The district court granted the defendant-officer's motion *in limine*, but the Seventh Circuit reversed. The Seventh Circuit explained that the defendant-officer's knowledge of the prior incident involving him and the plaintiff (which the City of Zion later found unwarranted) was relevant to whether his use of force was reasonable during the second encounter. *See id*. at 780 ("The fact that [plaintiff] had previously been subjected to excessive police force was one of the facts and circumstances known to [the defendant-officer] . . . [a]nd it would be hard to imagine that this knowledge was not running through [his] mind as they assessed the situation."). By comparison, the fact that Dakuras knows he previously shot at his wedding portrait and only received a one-day suspension does not appear relevant to whether the amount of force used against Kaufman was reasonable. While an officer's knowledge is critical

to the reasonableness inquiry, *see Burton*, 901 F.3d at 777, that does not include knowledge of events that have no relationship whatsoever to the incident in question. For the same reason, Dakuras' knowledge of the shooting and suspension is not relevant to whether there was probable cause to arrest for purposes of the malicious prosecution claim. Kaufman has simply failed to provide a propensity-free chain of reasoning to allow its admission.

But even if the Court assumed that the shooting and suspension have some probative value in this case, Rule 403 still counsels against admission due to the risk of undue prejudice. Indeed, there is a high likelihood the jury would conclude that someone who recklessly shoots at his own wedding portrait inside his own home is the same kind of person who would use excessive force while effectuating an arrest. That is precisely what the rules of evidence aim to prevent.

### 2. Prior Instances of Insubordination

Kaufman argues next that two instances of insubordination involving Dakuras should be admitted under Rule 404(b). In 2011, Dakuras allegedly ignored a direct order and executed a search warrant without uniformed officers present. R. 80 at 6. Then, in 2017, Dakuras allegedly conducted an out-of-state investigation without CPD approval and without notifying the out-of-state authorities. *Id*. Dakuras was not disciplined for either incident even though he purportedly violated CPD directives and procedures. According to Kaufman, these prior acts demonstrate Dakuras' "mindset" during the Wrigleyville encounter. That is, they show how Dakuras thought he could act like a "cowboy and get away with it" since he would be "protected

even [if] he violated the direct orders of higher-ranking officers." R. 80 at 6; R. 80-1 at 2.

This argument is rejected for the same reasons explained in the previous section. Furthermore, nothing in the record suggests that the CPD procedures Dakuras supposedly ignored in 2011 and 2017 are remotely similar to those he may have violated when he allegedly used excessive force against Kaufman. Nor are there any allegations in the complaint suggesting that Dakuras disregarded "direct orders of higher-ranking officers" outside of Wrigley Field. Thus, any "knowledge" that Dakuras supposedly gleaned from the previous events has little to no relevance to the underlying claims or issues raised in this case. Kaufman's argument is really just another veiled attempt to do precisely what Rule 404(b) forbids: ask the jury to infer that Dakuras violated CPD directives or otherwise engaged in misconduct on the night in question because he has allegedly done so on other occasions. *See Gomez*, 763 F.3d at 855; *Gonzalez v. Olson*, 2015 WL 3671641, at *24 (N.D. Ill. June 12, 2015) ("At base, Plaintiff's argument is that [defendant] did this once and it worked, so he did it again twelve years later.").

### 3. Seizure of Gun and Subsequent Lawsuit

Kaufman points next to an event in 2015 in which Dakuras, Mirus, and others searched a house twice and found a gun that lawfully belonged to a security guard. R. 80 at 7. Dakuras and Mirus intended to take the gun during the initial search but forgot to bring it with them when they left. *Id*. When Dakuras and Mirus returned to the house to pick up the gun, they allegedly threatened people inside and took one

person to the Homan Square police facility for several hours without filing charges. *Id.* According to Kaufman, Dakuras and Mirus were later sued as co-defendants in federal court.

Kaufman argues that the incident should be admitted because it speaks to Dakuras' and Mirus' motive. More specifically, Kaufman contends that being co-defendants in multiple lawsuits gives Dakuras and Mirus "a motive to cover-up to protect one another." R. 80-1 at 3. On the surface, this argument seems somewhat compelling—with a lawsuit pending against them at the time, Dakuras and Mirus potentially had a motive to cover up their alleged wrongdoing outside Wrigley Field. But what Kaufman neglects to mention is that the lawsuit stemming from the incident settled a month before the events giving rise to this complaint.[4] *Compare Tolbert Jones, et al., v. City of Chicago, et al.*, 16-cv-03201, Dkt. 16 (stipulation of dismissal filed October 5, 2016), *with Kaufman v. City of Chicago, et al.*, 17-cv-07491, Dkt. 1 (underlying events occurred on November 2, 2016). What is more, court filings show that Mirus was never named as a defendant in the earlier lawsuit. *See generally Tolbert Jones, et al., v. City of Chicago, et al.,* 16-cv-03201, Dkt. 1. If the *Jones* lawsuit settled a month before the events in this matter occurred, and if Mirus was not a named defendant in that case, then the Court cannot conclude that the *Jones* incident shows how Dakuras and Mirus had a motive to cover up their excessive force against Kaufman.

---

[4] Kaufman does not suggest that the settlement included any particular findings of fact or liability.

Kaufman also argues, without more, that the incident is admissible because it proves Dakuras' and Mirus' "habit, opportunity, and plan." R. 80-1 at 3. Kaufman, however, cannot "simply point to a purpose in the 'permitted' list and assert that the other-act evidence is relevant to it." *Gomez*, 763 F.3d at 856. Other-act evidence may be admitted "only when its admission is supported by some propensity-free chain of reasoning." *Id*. Kaufman has not provided the Court with any chain of reasoning, no less one that is propensity-free, concerning "opportunity" and "plan".

Furthermore, Kaufman's reliance on "habit" evidence is misplaced because evidence of a person's habit is governed under Rule 406, which provides that such evidence "may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." "[B]efore a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." *Nelson v. City of Chicago*, 810 F.3d 1061, 1073-74 (7th Cir. 2016). Kaufman does not advance any Rule 406 argument other than saying that the *Jones* incident shows how Dakuras and Mirus take things that "don't belong to them and create dangerous and humiliating situations." R. 80-1 at 3. That reasoning is plainly insufficient under Rule 406, and relies on a forbidden propensity inference under Rule 404(b). *See Gomez*, 763 F.3d at 855 ("Rule 404(b) excludes relevant evidence of other crimes, wrongs, or acts if the purpose is to show a person's propensity to behave in a certain way."); *see also Burton*, 901 F.3d at 779  (other-act evidence may be allowed

for certain purposes but cannot be used to show that an officer has a tendency to use excessive force).

### 4. Other Civilian Complaints Involving Violent Behavior

Kaufman also seeks to introduce dozens of other civilian complaints filed against Dakuras and Mirus in which they were accused of engaging in violent behavior. R. 80 at 7; R. 80-1. The Court will not list out each complaint, but a few that Kaufman highlights in his motion include:

- In 2000, Dakuras allegedly grabbed a man by his cervical collar and slammed him against the wall while pushing the man's wife down the stairs.

- In 2002, Dakuras allegedly struck a man in the face, and also poked his eyes and headbutted him.

- In 2004, Dakuras allegedly twisted a man's arms while punching him in the face and knocking out his tooth.

If true, these prior events are unquestionably concerning. But counsel for Dakuras has represented to the Court that almost all the events described in Kaufman's motion, including those listed above, are based on civilian complaints that have not been sustained.[5] The Court therefore questions whether a jury could find by a preponderance of the evidence that these events actually occurred. *See Gomez*, 763 F.3d at 854 (explaining that other-act evidence may not be admitted unless the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed). The Court's skepticism is not alleviated by the fact that

---

[5] By comparison, and as discussed *infra*, the complaint highlighted in the subsequent section of this opinion was sustained.

Kaufman has identified victims or witnesses of Dakuras' misconduct who are reportedly able to testify at trial. Many of the events in question took place decades ago; some even occurred in the mid-1990's. Memories fade over time and putting witnesses on the stand to discuss unsubstantiated events from many years ago will lead to "distracting and time consuming mini-trials regarding the merits of these other allegations." *See Patterson v. City of Chicago*, 2017 WL 770991, at *4 (N.D. Ill. Feb. 28, 2017) (declining to admit other-act evidence under Rule 403). Even if that was not the case, these events would still be inadmissible because Kaufman has again failed to provide a propensity-free chain of reasoning supporting their admission under Rule 404(b). Accordingly, evidence from these other events will not be admitted at this time.

### 5. BIA Investigation, Report, and Recommended Suspension

Finally, Kaufman seeks to admit evidence from an incident last year involving Dakuras which resulted in an internal police investigation and a recommended suspension of 30 days.

On the evening of May 14, 2020, Chicago police officers responded to a notification that a gunshot had been fired near a vacant lot.[6] The officers arrived at the scene and found an off-duty Chicago police officer in the area with a firearm. The responding officers attempted to interview the off-duty officer to determine whether he was connected to the shooting. The off-duty officer was intoxicated, agitated, and

---

[6] The allegations described in this section of the opinion are from an internal police report that the parties did not file on the docket.

largely uncooperative. At one point, the off-duty officer pushed a responding officer and resisted arrest. Handcuffs were eventually placed on him and he was taken to the police station for an administrative investigation.

When the officers arrived at the station, they met with Dakuras who was working that evening as the watch commander. Dakuras and the responding officers reviewed body-camera footage of the incident while the off-duty officer was placed in Dakuras' office. Officers also examined the off-duty officer's gun, and discovered that at least one bullet was missing from the magazine. In the hours that followed, Dakuras, members of CPD's Bureau of Internal Affairs ("BIA"), and other police personnel discussed how to handle the situation given the somewhat unique set of circumstances that confronted them—indeed, an off-duty officer had been found intoxicated with a gun near the scene of a shots-fired call, and had physically pushed one of his on-duty colleagues while resisting arrest. Ultimately, Dakuras determined that the incident would be handled administratively and that the officer would not be arrested for battery. This determination, however, was made unilaterally. Furthermore, and of importance here, Dakuras briefed the deputy chief of police about the incident after it occurred but supposedly omitted critical information from their conversation.

According to a BIA investigation into the matter, Dakuras did not initially tell the deputy chief about the off-duty officer's battery, resisting arrest, or discharged firearm. The deputy chief told a BIA investigator that Dakuras "withheld" that information from him, and that the off-duty officer should have been charged with

battery despite Dakuras' unilateral decision otherwise. Dakuras supposedly admitted to a lieutenant that he had not shared all the relevant facts of the incident with the deputy chief when the two initially talked. What is more, a BIA investigator interviewed Dakuras as part the investigation and found that he repeatedly "contradicted himself" throughout the interview.

The BIA investigation issued a report in November 2020 which concluded that Dakuras violated Rules 2, 5, and 11 of the Chicago Police Departments Rules of Conduct. Rule 2 prohibits "[a]ny action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department," while Rules 5 and 11 cover "the failure to perform any duty," and "the competency of inefficiency in the performance of duty," respectively. In other words, the BIA found that Dakuras failed to supervise officers during an investigation, failed to make the appropriate notifications regarding the incident, and failed to make sure that an arrest report was made for the off-duty officer. BIA ultimately recommended that Dakuras be suspended for 30 days, and stripped him of his police powers during the course of the investigation. Dakuras recently filed a grievance to challenge BIA's findings and the proposed discipline. The grievance process is ongoing and BIA's recommended suspension is not final.

Kaufman argues that the underlying incident, BIA report, and 30-day suspension should be admitted under Rules 404(b) and 608(b), and for purposes of punitive damages.[7] The Court discusses each argument in turn.

A. Rule 404(b)

Kaufman maintains that he should be able to introduce the BIA report to establish Dakuras' "plan, intent, and modus operandi" in covering up the excessive force outside of Wrigley Field. R. 100 at 7. The Court can quickly dispose of the modus operandi argument. Although other acts may be used to show that a defendant has a modus operandi, any such evidence is usually offered to prove identity. *See, e.g.*, *United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019) (finding that other-act evidence was properly admitted to prove identity through modus operandi); *United States v. Connelly*, 874 F.2d 412, 417 n. 7 (7th Cir. 1989) ("Rule 404(b) does not specifically enumerate 'modus operandi' proof as an exception for similar act evidence but this court has approved the introduction of modus operandi evidence under the 'identity' exception to Rule 404(b)."). Identity is not at issue here because Dakuras does not assert that Kaufman has him mistaken for a different police officer. *See Hill v. City of Chicago*, 2011 WL 3840336, at *3 (N.D. Ill. Aug. 30, 2011) (reaching same conclusion). Moreover, even if Kaufman's modus operandi theory was applicable, courts require the other act to bear a high degree of similarity to the one at issue in the case, and Kaufman has not made such a showing here. *See, e.g.*, *Treece v.*

---

[7] Kaufman also argues that statements Dakuras made to the BIA investigator are admissible because they are non-hearsay statements (also called "admissions") by a party-opponent under Rule 801(d)(2)(A). Dakuras does not contest this argument.

*Hochstetler*, 213 F.3d 360, 363 (7th Cir. 2000) ("In order to ensure that the evidence at issue is not offered to establish [the defendant's] propensity to commit the acts for which he is accused, we require that [the prior bad acts] evidence bear a singular strong resemblance to the pattern of the offense charged.") (internal citation and quotation marks omitted).

Next up are Kaufman's arguments regarding plan and intent. Kaufman makes three points. First, Kaufman compares this case to the facts underlying the BIA incident. He argues that Dakuras knew Kaufman was not "intoxicated" or "out of control," but arrested him anyway. In contrast, Dakuras allegedly knew that the off-duty officer in the BIA incident was intoxicated and had committed battery but nevertheless allowed him "to go home." While the Court understands the comparison, nothing about it bears on Dakuras' intent or plan to cover up his alleged use of excessive force outside of Wrigley Field. If anything, the comparison shows that Dakuras treated an off-duty officer better than a private citizen, but that is not a basis to admit other-act evidence under Rule 404(b).

Kaufman argues next that the BIA incident shows how Dakuras "knew that he could tell the uniformed officers" outside Wrigley Field "to move on" and that he "could write whatever narrative was necessary to protect himself and Defendant Mirus." That argument doesn't work on two levels—first, the BIA incident occurred four years after the Wrigley Field incident. It defies the laws of time and space to conclude that Dakuras would know in 2016 how to cover up misconduct based on an event in 2020. Second, the BIA incident shows that Dakuras could *not* "write

whatever narrative was necessary to protect himself and Defendant Mirus" since the internal police report recommended that Dakuras be suspended for 30 days. Finally, Kaufman claims that the BIA incident shows how Dakuras used his authority "to cover up police misconduct and prevent the off-duty officer from facing criminal prosecution." Maybe so. But that does not speak to or otherwise prove Dakuras' supposed plan or intent to cover up the Wrigley Field incident. And in any event, Kaufman's argument relies on the forbidden inference that Dakuras was more likely to cover up the Kaufman incident since he allegedly attempted to cover up the off-duty officer's conduct in the BIA incident. *See Gomez*, 763 F.3d at 856.

B. Rule 608(b)

While Kaufman's arguments fail under Rule 404(b), they fare better under Rule 608(b). Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." On cross-examination, however, the Court may "allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of" the testifying witness. *Id.*

Kaufman argues that he should be allowed to ask Dakuras about the BIA incident on cross-examination because the deputy chief of police said that Dakuras withheld critical information from him and because the BIA report found that Dakuras repeatedly contradicted himself during his interview with the investigator. R. 100 at 4-6. Kaufman also argues that the issue of Dakuras' truthfulness is relevant

to this proceeding because, as mentioned, Dakuras allegedly wrote false police reports to cover up his own misconduct outside Wrigley Field. For his part, Dakuras points out that the BIA report did not conclude that he made a false statement or otherwise lied. R. 101 at 6-7. He recognizes the report's conclusion that he made "contradictory statements" during the interview, but argues that there is a difference between being "contradictory" and "untruthful". *Id.* Finally, Dakuras maintains that if questions about the incident are permitted under Rule 608(b), then Kaufman should only be allowed to ask about the contradictions themselves and not the underlying facts or 30-day suspension. *Id.* at 7.

As stated, Rule 608(b) permits a party to inquire into specific instances of a witness's conduct "if they are probative of the [witness's] character for truthfulness." Even though the BIA did not conclude that Dakuras lied, there is little doubt that Dakuras' omission of critical information and contradictory statements—which were documented in a formal police investigation—are probative of his character for truthfulness. According to the BIA report, the deputy chief of police believes Dakuras omitted material facts about the incident when the two spoke over the phone. The deputy chief said that Dakuras "withheld information from him," and that the situation would have been handled differently had Dakuras told him all the relevant details. Depending on the circumstances, "[a]n omission can be as dishonest as an outright lie." *United States v. Seymour*, 472 F.3d 969, 970 (7th Cir. 2007) (considering whether Rule 608(b) allowed counsel to ask officer about an omission in a police

report). The Court does not have trouble concluding that the omission at issue here is probative of Dakuras' character for truthfulness.

Furthermore, and as alluded to above, some of Dakuras' statements highlighted in the BIA report appear to be contradictory at best and untruthful at worst. For example, Dakuras initially told an investigator that he made the "immediate" decision to handle the underlying incident administratively rather than criminally. Later in the interview, however, he said that he conducted both an administrative investigation *and* a criminal investigation. The BIA found this to be an "inconsistent[]" and "contradictory" statement. The Court agrees. Dakuras either did or did not conduct a criminal investigation. If he made the "immediate" decision to handle the incident administratively, then it's difficult to see how he was being truthful when he said later in the interview that he also conducted a criminal investigation. Allowing counsel to ask Dakuras about the BIA incident is fair game since Kaufman claims that Dakuras wrote false reports to cover up his alleged use of excessive force. *See Battle v. O'Shaughnessy*, 2012 WL 4754747, at *4 (N.D. Ill. Oct. 4, 2012) (permitting counsel to ask officer about a BIA report which reached similar conclusions as those at issue here). And, unlike using the BIA incident under Rule 404(b) to show propensity (which is prohibited), the incident is admissible under Rule 608(b) to probe whether Dakuras' testimony is truthful.

That being said, the Seventh Circuit has instructed that even if evidence of prior conduct is relevant to a witness's truthfulness, "[w]hat questions are allowed remains subject to 'the overriding protection of Rule 403,' which requires that their

'probative value not be outweighed by danger of unfair prejudice, confusion or issues, or misleading the jury.'" *United States v. Abair*, 746 F.3d 260, 263 (7th Cir. 2014) (quoting Rule 608(b) Advisory Committee Note for 1972); *see also Seymour*, 472 F.3d at 971 ("Rule 403 establishes the standard for the exercise of the judge's discretion in evidentiary matters, which of course includes cross-examination" under Rule 608(b)). With this in mind, counsel may ask Dakuras questions that put the omissions and contradictory statements in context for the jury. *See Nelson*, 810 F.3d at 1068 (noting that Rule 608(b) permits inquiry into "the specific conduct underlying" an arrest if it is "probative of the witness's character for truthfulness"). However, counsel is not permitted (for now) to discuss the 30-day suspension or the fact that he was temporarily stripped of his police powers. Dakuras recently appealed the suspension and the risk of unfair prejudice is not lost on the Court. This ruling may be modified at trial depending on how Dakuras answers counsel's questions.

C. Punitive Damages

Finally, Kaufman argues that the BIA incident is relevant to punitive damages. More specifically, Kaufman maintains that the jury will likely be instructed to consider not only Dakuras' conduct, but also his "subjective intent," including whether he acted "maliciously, with ill will or spite, or in complete indifference to [Kaufman's] safety or rights." R. 100 at 8. Kaufman claims that when jurors make this determination, they should be allowed to hear that Dakuras' alleged misconduct was not "mistaken, sporadic, or random." *Id.* Kaufman also argues that the BIA

incident speaks to Dakuras' knowledge, intent, and plan, which the jury should consider for purposes of punitive damages.

On the last point, the Court has already concluded that the incident cannot come in under Rule 404(b) to show Dakuras' knowledge, intent, or plan, and Kaufman makes no additional arguments explaining why that conclusion should change in the context of punitive damages. Regarding Kaufman's other arguments, the Supreme Court has cautioned that "a defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003). "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* Both the BIA incident and Wrigley Field incident involve Dakuras and allegations of misconduct, but that is where the similarities end. The BIA incident is an internal police investigation that happened four years after the allegations in this case occurred. And importantly, the BIA incident has no relation to Kaufman—he is not a member of the CPD nor was he involved in the underlying allegations in any way. In short, the BIA incident will not be admitted into evidence for purposes of punitive damages.

## Conclusion

At bottom, Kaufman has failed to present a coherent theory explaining why the other-act evidence presented in his motions *in limine* are admissible under Rule 404(b). While the Court has expressed its legitimate concern over some of the civilian complaints filed against Dakuras (and Mirus), that concern in and of itself does not

allow the Court to skirt the federal rules of evidence. The arguments Kaufman has offered to date have either been unrelated to the permissible uses of other-act evidence under Rule 404(b)(2), or have not been supported by some propensity-free chain of reasoning. Accordingly, Kaufman's motion *in limine* No. 4 is denied without prejudice. Kaufman's motion *in limine* No. 14 is denied in part and granted in part. The motion is denied to the extent it seeks to admit evidence from the BIA incident pursuant to Rule 404(b) and for purposes of punitive damages. The motion is granted, however, in that counsel may ask Dakuras questions under Rule 608(b) that put the omissions and contradictory statements in context for the jury. As explained, counsel may not mention the 30-day suspension or the fact that he was temporarily stripped of his police powers.

ENTERED:

_Thomas M. Durkin_

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: May 11, 2021